IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 24, 2004 Session

## STATE OF TENNESSEE v. TAMMY KINCANNON[1]

**Direct Appeal from the Criminal Court for Roane County**
**No. 12483B     E. Eugene Eblen, Judge**

_____

**No. E2003-01564-CCA-R3-CD - Filed July 19, 2004**

_____

Following a jury trial, the defendant, Tammy Kincannon, was convicted of aggravated sexual battery, a Class B felony, and sentenced as a violent offender to eight years in the Tennessee Department of Correction. On appeal, she argues that the evidence was insufficient to support her conviction and that the trial court erred in not requiring the State to make an election of the offenses and in not instructing the jury as to the lesser-included offenses of aggravated sexual battery. Following our review, we agree that the State failed to make an election and reverse the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Remanded for a New Trial**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

Charles B. Hill, II, Kingston, Tennessee, for the appellant, Tammy Kincannon.

Paul G. Summers, Attorney General and Reporter; Michelle R. Chapman, Assistant Attorney General; J. Scott McCluen, District Attorney General; and D. Roger Delp and Frank A. Harvey, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

_____ At the defendant's March 26, 2003, trial, the victim, A.F.,[2] testified that she was born on January 25, 1988, that the defendant is her mother, and that she was currently living with her father

_____

[1] We note that the defendant had remarried at the time of trial, and her last name had been changed to "Carpenter." However, it is the policy of this court to use the defendant's name as it appears in the indictment.

[2] It is the policy of this court to refer to minor victims of sexual abuse by their initials.

and stepmother in Alabama. However, in the summer of 1996, the victim and her sister were living with their mother and stepfather, Terry Kincannon, in a house trailer in Roane County, Tennessee. She said that her stepfather had been charged with sex offenses committed against her in the summer of 1996 and at other times and that the defendant had witnessed some of the incidents. The victim then related an incident when the defendant had sexual contact with her:

> Q   I want you to tell the jury in your own words, during the summer of '96, what contact, if any, physical contact you or your mother had when these things were going on with your stepfather, [T]erry Kincannon.
>
> A   My mother and I had kissed. We had . . . touched, and our mouth parts had went down on our private parts on each other.
>
> Q   Between the legs?
>
> A   Yes, sir.
>
> Q   Did your mother's mouth go down between your legs?
>
> A   Yes, sir.
>
> Q   Did she touch you there?
>
> A   Yes, sir.
>
> Q   Did your mouth go down between her legs?[3]
>
> A   Yes, sir.
>
> Q   Is this something that your stepfather encouraged you and your mom to do?
>
> A   He said that it would – that if she loved him that she would do it. So he kind of encouraged.
>
> Q   And did she say anything to you when she was doing this?

---

[3]Although the victim testified as to two acts, apparently occurring during the same episode, we are considering these as a single act for the purposes of our review. However, this is not necessarily the case in a retrial of this matter. See State v. Kendrick, 38 S.W.3d 566, 569 (Tenn. 2001).

A    It was kind – it was quiet.  No one really said anything.  It was just like a – it was – nothing was really said.

Q    Did you say anything to either one of them while this was going on?

A    No, sir.  I was just – I was scared.

. . . .

Q    Just to make sure it's clear, I want to go back.  When you talked about touching between the legs, which is touching in the vagina area–

A    Yes, sir.

Asked how she knew that it was the summer of 1996 when the incident between her and the defendant occurred, the victim replied, "Because I can remember just about –  I was – I can kind of remember how old I was on some of this stuff.  And about '96 I was in the second or third grade, and I was living in the trailer."  She could not remember the date or the day of the week of the incident, or whether it had occurred during the school year, but said she was certain it had occurred in the trailer she lived in in Roane County.

The victim said that when the defendant initially asked her if anything had been happening between her and Terry Kincannon, she denied anything had happened, but she and her sister later told the defendant what their stepfather had been doing to her.  She acknowledged that Mr. Kincannon had given her money "for doing that stuff."  The victim said that, even after the defendant knew that Mr. Kincannon was sexually abusing her, the defendant would tell her that Mr. Kincannon wanted her and would send her to him.  She said that when she was in the second grade she learned that Mr. Kincannon had been "messing with" her sister as well.  After the defendant moved with her two daughters to an apartment, a Department of Children's Services ("DCS") representative came to talk to the victim.  The victim could not remember exactly when she talked to the DCS representative but said "it was after my mom and I had done what was going on."  She told the DCS representative what Mr. Kincannon had done to her but did not tell about the incident with the defendant.

After the victim's father obtained custody of her, she was examined at a hospital and later told her father, stepmother, sister, and a counselor about the incident with the defendant.  The victim said "after everything had gotten started with the Court and stuff," while she was in the seventh

grade, she had written down what she could remember about the incident with the defendant.[4]  The victim acknowledged that she had written in her notes that the defendant told her after the incident that "she really didn't want to do it."  Asked if she thought the defendant had molested her for sexual gratification, the victim responded, "I'm positive that, you know, she didn't want to do it.  Or . . . nobody would want to do anything like that unless they're sick, I mean, in the head. . . .  But she did.  He did."

Stacy Griffin, a child protective services supervisor with the DCS, testified that she received a referral involving Terry Kincannon in May 2000 and that she interviewed the defendant twice, first on August 8, 2000, and then again on November 28, 2000.  Investigator Linda Booth was present at both interviews.  During the second interview, the defendant told Griffin that the first time she remembered something sexual happening with the victim was in the summer of 1995 when Mr. Kincannon got on top of her in the victim's presence and told the victim that "this was how mommas and daddies make love."  The defendant said she then performed oral sex on Mr. Kincannon and that the victim "kissed her breasts like a newborn."  Mr. Kincannon wanted the defendant to perform oral sex on the victim at that time, but the defendant refused.  Toward the end of the interview, Griffin asked the defendant if anything had happened between her and the victim.  The defendant then told her about an incident that she thought had occurred in May or June of 1995 when Mr. Kincannon made her perform oral sex on the victim and made the victim perform oral sex on her and on him.  Griffin said that the defendant "talked pretty freely" during this interview.

Linda Booth, a former investigator for the Roane County Sheriff's Department, testified that during the second interview, the defendant said that "when you're married you do whatever you can to please your man.  And said [Terry Kincannon] was very aggressive.  If he didn't get his way he would get very upset.  She said he manipulated her into doing something, 'something I didn't want to do.'  And then went on to talk about what [the victim] had already described what happened between the two of them."  Booth said that the defendant was not advised of her Miranda rights at that time because she was not in custody.

The thirty-five-year-old defendant testified that she married Terry Kincannon in 1994 when the victim was six years old and her other daughter was three years old.  Asked if Mr. Kincannon's character had changed after they married, she replied, "[H]e took control of my mind and my body, my life, the girls' life, and their minds.  Telling them that he's the only one that loves us.  That my parents didn't love me.  And I believed him, because they never did come around when I was married to him."  She said that Mr. Kincannon had been physically abusive to her during the marriage, saying he had choked her with a clothesline in 1998 because he did not have any crack cocaine and had choked her with a pair of pantyhose and beat her in 1996 or 1997.

The defendant said that Judy Brown was Mr. Kincannon's first wife and that she became friends with her after she left Kincannon in November 1999 because of his drug problem.  She first

---

[4]Following a bench conference, defense counsel was furnished with a copy of the victim's notes.  However, the notes are not included in the record on appeal.

met Brown in 1994 and had visited in her home with Mr. Kincannon during family gatherings and holidays. When the defendant learned from Ms. Brown that Mr. Kincannon had molested their daughter, she and Brown asked the victim if Mr. Kincannon had molested her. The victim initially said "no" but later told the defendant he did. The defendant reported Mr. Kincannon to the authorities the next morning.

The defendant acknowledged that she spoke to Investigator Booth and DCS Supervisor Griffin "about two or three times." She remembered telling them that Mr. Kincannon manipulated her and that she was scared. She denied having oral sex with the victim but admitted having sex with Mr. Kincannon in the victim's presence in January 1996 because he threatened to hurt her and her daughters. Asked if she had ever said that she had oral sex with the victim for about a minute, she replied, "Maybe at one time." However, on cross-examination, the defendant first denied making the comment but later acknowledged that she "could have said it." She said that the victim's testimony was untruthful and suggested that the victim testified as she did because she had been away from the defendant for three years and was upset.

On cross-examination, the defendant acknowledged that she thought "there was something seriously wrong with the way that [Mr. Kincannon] viewed [the victim]," but she did not do anything about it. She said her daughters told her in May 2000 that Mr. Kincannon had been molesting them. She admitted having contact with Mr. Kincannon near the end of May 2000, even after signing a contract with the DCS agreeing to keep her daughters away from him. She acknowledged that she had had an affair during her marriage to Mr. Kincannon and that Mr. Kincannon told the victim about her affair. She said she had stayed with Mr. Kincannon because he provided her and her daughters with a place to live and because he was a father to her daughters.

Judy Brown testified that she was married to Terry Kincannon for about three years and that they had been divorced for about twenty-eight years. They had one daughter together and had kept in contact through the years after their divorce. In April or May 2000, Ms. Brown's daughter told her that Mr. Kincannon had masturbated in front of her and on her and had rubbed her when she was a child. When Ms. Brown confronted Mr. Kincannon about their daughter's accusation, he did not deny it, saying that "he was just human." Ms. Brown said, after learning what had happened to her daughter, she was concerned about the defendant's daughters and was present when the defendant talked to them in April or May. She said at that time the defendant's daughters denied that anything had happened between them and Mr. Kincannon. Ms. Brown said Mr. Kincannon was manipulative and she once had been hospitalized as a result of injuries he inflicted upon her. Ms. Brown acknowledged that the defendant was currently married to her brother.

## ANALYSIS

### I. Election of Offenses

The defendant argues that the State failed to make an election of offenses at the close of its proof, saying there was testimony regarding two, or possibly three, incidents of aggravated sexual battery.

Our supreme court explained in State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001), the prosecution's responsibility as to the election of offenses: "This Court has consistently held that the prosecution must elect the facts upon which it is relying to establish the charged offense if evidence is introduced at trial indicating that the defendant has committed multiple offenses against the victim." Id. (citations omitted). The election necessity applies when there is proof of multiple offenses committed during the period alleged in the indictment:

> [W]e recognized in Rickman that out of necessity indictments often charge general time frames that encompass several months. In those instances, we concluded that the State may introduce evidence of sex crimes allegedly committed against the victim during the time frame charged in the indictment, but, at the close of the proof, the State must elect the facts upon which it is relying for conviction.

Id. at 631 (citation omitted).

We now will determine whether an election was required in the present appeal and, if so, whether the State elected the offense on which it was proceeding.

The indictment alleged that the defendant committed aggravated sexual battery on the victim "on or about Summer of 1996," and the victim testified that she and the defendant performed oral sex on each other during the summer of 1996. Although she could not remember the date or the day of the week, the victim said she knew the incident occurred in the summer of 1996 "[b]ecause I can remember just about – I was – I can kind of remember how old I was on some of this stuff. And about '96 I was in the second or third grade, and I was living in the trailer." According to the testimony of Stacy Griffin, a DCS supervisor, the defendant admitted to one or more acts of oral sex with the victim in May or June of 1995. Thus, the defendant is correct in asserting that the State presented evidence of at least two sexual acts between the defendant and the victim.

During the defense proof, at the conclusion of the defendant's testimony but before Judy Brown's testimony began, defense counsel requested that the State make an election as to which offense it was proceeding on:

[DEFENSE COUNSEL]: If I'm recalling this proof, you've got about possibly two or three incidents of alleged wrongdoing in here. And I haven't heard an election yet.

[PROSECUTOR]: Just a second and I'll make that election.

That election is aggravated sexual battery in '95 or '96.

[DEFENSE COUNSEL]: Somewhere in '95 or '96 is kind of a long period of time, isn't it?

[PROSECUTOR]: It's okay as long as we're saying one time. It's okay. (indiscernible) offense.

[DEFENSE COUNSEL]: Okay. Well, I'm going to object to that election and move for a mistrial.

THE COURT: Overruled.

As we understand this interchange, the State agreed that an election was required by the proof and selected not an act but, instead, the period during which the acts had occurred. In sum, by purporting to make an election, the State implicitly agreed that at least two sexual acts between the victim and the defendant had been proven and recognized that an election was required. However, the time period selected by the State for this election, "'95 or '96," encompassed both the 1996 acts testified to by the victim and the 1995 act which the defendant had admitted to DCS Supervisor Stacy Griffin. Thus, while the State recognized that the trial testimony required an election, no election was made.

At the hearing on the motion for new trial, the defense argued, *inter alia*, that the evidence was insufficient to support the conviction for aggravated sexual battery, that the State failed to make an election as to "at least three different events testified to," and that the trial court erred by not instructing as to facilitation of sexual battery, as well as simple battery or assault. As to these claims, the State responded that the evidence was sufficient to sustain the conviction and that, as to electing an offense, the prosecutor "stood over there and said to the jury, here's the one we're talking about." At the conclusion of the hearing, the trial court stated, as to the State's responses regarding the sufficiency of the evidence and the election of the offense, "I agree that that happened during the course of the trial."

The sparseness of this record has made our review difficult. By order of this court, the appellate record was supplemented with the jury instructions, which include neither an identification of the date of the offense for which the defendant was tried nor "heightened" instructions utilized when evidence of other crimes is in the record. The record on appeal consists of the trial testimony and that of the sentencing and motion for new trial hearings. Beyond the interchange previously set out in this opinion, there are no statements by the prosecution selecting the specific offense on which

-7-

it was proceeding.  Thus, the prosecutor's standing "over there and [saying] to the jury, here's the one we're talking about," as the State asserted and the trial court agreed had occurred, could have happened only during opening statements or closing arguments, neither of which was transcribed for the appellate record.  Normally, we might simply assume that the prosecution's recollection was correct and the missing portion of the record would so reflect, resulting in our dismissing the defendant's election argument as waived because she failed to supply a sufficient appellate record. See  Tenn. Ct. Crim. App. R. 10(b); State v. Miller, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987).  However, it would be inconsistent with the State's election, as we have set out, of  "aggravated sexual battery in '95 or '96" for the State later to have made a specific election of one of the summer 1996 acts of oral sex, testified to by the victim, or the May or June 1995 act, confessed to by the defendant to the DCS supervisor.

Accordingly, we conclude that the State was incorrect in recalling that an election, other than the one which we have set out, had been made.  While we recognize that it is quite unlikely the State would have elected to proceed on other than the summer of 1996 act testified to by the victim, the fact remains that the State created this issue by presenting proof of the defendant's committing aggravated sexual battery in 1995, recognizing the need to make an election as to these offenses, but then doing so in such a fashion as to permit, with the single verdict, some jurors to convict the defendant of the 1996 act of which the victim testified, while others could convict for the 1995 act, of which the defendant confessed.  Accordingly, we agree with the defendant's argument that the State failed to make an election as to the offenses of which it had presented proof, and, thus, reverse the conviction and remand this matter for a new trial.

## II.  Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to support her conviction for aggravated sexual battery, saying "the only agreement was that something happened at the trailer. No one can say when something happened, what happened, how something happened, or why something happened.  There is just too much uncertainty in the evidence."  While we disagree with this view of the evidence, we are unable, for reasons which we will explain, to review these claims.

Where sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or crimes beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); State v. Elkins, 102 S.W.3d 578, 581 (Tenn. 2003).  The weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the triers of fact.  State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996).

To prove aggravated sexual battery, the State was required to show "unlawful sexual contact" with the victim by the defendant or the defendant by the victim accompanied by any of the following circumstances:

(1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon;

(2) The defendant causes bodily injury to the victim;

(3) The defendant is aided or abetted by one (1) or more other persons; and

(A) Force or coercion is used to accomplish the act; or

(B) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless; or

(4) The victim is less than thirteen (13) years of age.

Tenn. Code Ann. § 39-13-504. "Sexual contact" is defined as "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Id. § 39-13-501(6).

As we have set out in detail, the State presented proof as to acts of aggravated sexual battery occurring in 1995 and 1996. Assuming, for the purposes of our review of this issue, the State properly had elected to proceed on one of the incidents, the record does not reveal which one was selected. Thus, this court, in reviewing the issue, presumably must consider whether the evidence is sufficient to sustain a conviction as to all acts testified to, ensuring, in that fashion, that we would determine the sufficiency as to the offense elected by the State. However, we decline to engage in such a theoretical exercise, especially in view of the fact that the defendant's conviction is being reversed.

### III. Lesser-Included Offenses

The defendant argues that the trial court erred in not instructing the jury as to any lesser-included offenses of aggravated sexual battery, specifically, facilitation of aggravated sexual battery. She contends that the jury should have been instructed as to facilitation because she only did what her husband demanded of her, and she did not have "the intent or willingness to do the bad act and to get sexual arousal, she did only render substantial aid."

As we have stated, this court, by its order, supplemented the record to include the instructions, which show, as the defendant asserts, that the jury was not instructed as to any lesser-included offenses. However, we face the same problem in considering this issue in determining the

sufficiency of the evidence. Without knowing whether the State elected to proceed on the 1995 or 1996 offenses, assuming for purposes of considering this issue that the State did elect to proceed on one or the other, we cannot determine what offenses should have been charged and the effect of charging no lesser-included offenses, for the considerations are not the same as to the different offenses. Since we have concluded that the required election was not made and we are reversing the conviction, we decline to address this issue.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we reverse the judgment of the trial court and remand for a new trial.

_____
ALAN E. GLENN, JUDGE